Our next case is Yeda Research and Development Company versus Mylan Pharmaceuticals. So as I mentioned before, we'd like to hear from the parties on the SAS opinion on the parameters that I spoke about in a general sense, also on how we should treat that opinion, but also how it applies specifically to this case. I'd be happy to do so, Your Honor, and I appreciate your raising it and giving us the opportunity. And this is Mr. J. No time right now, but don't take up a lot of time. I don't think it will take me very long, Your Honor. And so I'll cover just a couple of points. And I think it really would be a question for Mr. Anstead, because he represents the petitioner. But in this case, I think that the three salient points are, number one, in this case, the board invalidated all the claims. And the petitioner did not take a cross appeal. So the petitioner could not ask this court to set aside anything that the board had done without taking a cross appeal. SAS would not be a basis for affirming on an alternative ground, because it would be taking up something that the board literally never did. Just to get the facts out on the table, in this case, the board invalidated all of the claims challenged in the petition. It did not institute on two grounds that were raised in the petition, but it did address all of the claims. So if you look at pages one and four of the Supreme Court... And those two grounds were with respect to one prior reference? One was anticipation, one was obviousness, but on a different combination. If you look at the question presented in the Supreme Court, if you look at page one of the Slip Opinion, and I believe at page four of the Slip Opinion, you'll see that the court is focusing primarily on Section 318, which is about the requirement that a final written decision address every claim challenged by the petitioner. And that was done here. We understand that the Patent Office has now adopted a procedure whereby it will not do partial institution anymore, but we don't take that to be compelled by the Supreme Court's decision. It's certainly not compelled by anything in Section 318, and that would have nothing to do with... Is the institution, the partial risk institution you're talking about, does that apply only to the claims or to the grounds above? My understanding, and again, this is just based on guidance that's just come out in recent days, and I don't pretend to have a thorough understanding of the Board's reasoning for doing this, but my understanding is that the Board is now going to institute not only on all claims, but on all grounds. I thought the Supreme Court was reasonably clear that both grounds and claims were encompassed within the scope of their decision. Is that not so? I don't have a firm position on that. Well, but doesn't the Supreme Court have a firm position on that? I had the impression they did. So here are the things that I think the Court would look at. So I think you would look at the statements on page 1 where the Court describes the question before it as all of the claims or only some. I think you would look at page 4, which says that the plain text of Section 318A supplies a ready answer. So those are the places that I... And, of course, the question presented on which the Court granted cert. Those are the things that I think would counsel in favor of looking at claim by claim. There certainly is language in the opinion that suggests that the Court was also looking at the petition and whether the petition controls the subsequent conduct of the IPR. But because none of this, I think, has anything to do with how this Court should dispose of this IPR appeal, candidly, we don't have a position on behalf of our client in this case. So in a nutshell, your position is that SES has no effect on this case? That's correct. All right. No cross-appeal, no possibility to affirm on alternative ground because of the additional work that it would require. Anticipation, of course, is a factual finding. So the Court can't do the anticipation work itself and affirm on the alternative ground on a factual finding that the Board never made. So I think that no cross-appeal and no ability to affirm on alternative ground, that's enough to say that this is not the case in which to address the impact of SES. I mean, Mr. Anstead, of course, represents the petitioner, and if he wants to try and raise something at this point, I'd be happy to reply to it, but that's my take. Mr. Anstead, can we hear from you, please? Thank you, Your Honor. I think we do have a fundamental agreement that this is not the case in which to address SES because the Board here instituted on every challenged claim in all three patents. But not all grounds. But not all grounds. Do you agree that the Court, or do you believe that the Court was reasonably clear in suggesting that it was grounds as well as claims? I think the key words there, Judge Bryson, are reasonably clear. Was the Court reasonably clear? And I certainly, when I read SES, I see how the Court's reasoning could be read that way. They say, for instance, at page 5 of the slip opinion, that in an inter-parties review, the petitioner is master of its complaint and normally entitled to judgment on all the claims it raises, not those that the decision-maker just might wish to address. And if the petitioner is the master of its complaint, then you could certainly see how one might read this to suggest that it relates not only to the claims but to grounds on patentability. Is it your position that even if that is the correct reading, there's nothing else that needs to be done in this case under SAS? I think in this case that is true, Your Honor, because there was a full institution on all claims. The Supreme Court's decision clearly addresses claims. Just to make sure, if we think that perhaps the PTO should have instituted on grounds, if we were to think that, is it your position that in this case that's not necessary because you are not asking the PTO to do that? You're not raising that issue before this court? We are not raising that issue before this court. That's absolutely right, Judge Stoll. I think if for some reason there was a remand here to the PTAB, and we don't think there is any reason for a remand to the PTAB, but if there was, it would be up to the PTAB to decide whether those grounds should then come into the proceedings because, as Mr. Jay said, they have issued some guidance that they are taking a, I think what they characterize as a conservative approach, and from here on forward, they're going to institute on all claims and all grounds. But I think the PTAB has also said they don't think the Supreme Court's decision compels that, but because there's enough uncertainty about that, that's going to be their procedure. But again, I don't think it directly impacts this case. If that's the case, should we expect the parties should have preserved a right to appeal? I think because with respect to claims, with respect to claims, Your Honor, partial institution on claims, I mean, there certainly could be an argument that you should have maintained a conditional cross-appeal, but of course that wasn't an issue in this case because the PTAB instituted on all claims across all three patents. So there was nothing for us to preserve that's dictated by S.A.S. All right, we thank the parties for the comments. This helps us in our sorting out S.A.S. as well. So let's get to the case, Mr. Jay. And you're reserving four minutes of your time for rebuttal. That's correct. May it please the Court, William J. Ferrieta. There's obviously some substantive overlap with the prior appeal, but one, I think, important difference, and this has been brought up by some of the questioning already, is that this Court is reviewing the PTAB in this case, and it can only review the PTAB, the agency decision on the grounds given by the agency. And I think a couple of Judge Bryson's questions bring out things on which the agency, for example, specifically declined to credit the other side's position. And it's just not permissible to try and backfill the holes in the agency's reasoning. In this case, we think the holes are really quite substantial, and I want to focus on three key deficiencies. And one has to do with the reasonable expectation of success with respect to three times a week. And the other two have to do with the Board treating the uncertain operation of the drug as a reason to find obviousness, as opposed to find non-obviousness. And third, the Board's refusal to acknowledge the minimum effective dose principle. But I really want to begin with the reasonable expectation of success on three injections a week. As I think has come out during my friend Mr. O'Quinn's rebuttal, but I think it's worth reiterating, three injections a week is not in the prior art, never studied, not even taught in the prior art for any GA product. In fact, there is no testing in the prior art of anything less than every other day. And there's certainly no testing of the 40 milligram dose in anything less than daily. So the idea that there is a reasonable expectation of success for three injections a week, the Board rested that on two things. One, CON 2009, which is impermissible for a whole host of reasons. CON 2009 is not a prior art. That is common ground. But the Board seemed to have accepted that proposition. I think there was a loose citation at some point to, well, it was stuck in the string citation. But the Board said on several occasions that it was treating it as not prior art. I think we have to take that at face value, don't we? I think it understood that it was not prior art. But I think, so I agree that far, Judge Bryson. But I also think that if you look at that string citation, and if you look at the Board's other usage of CON 2009, the way that the Board said it would use it in its ruling on the motion to strike just isn't consistent with how the Board actually used it in its decision. And let me explain why that is. So first, you're right that in the string cited page 18, the Board actually describes it as prior art. And I think, which, you know, you can call that a stray citation. But I think you should also look at why, what the Board emphasizes on pages 15 and 21. The Board underscores the fact that CON 2009 is twice weekly. That's the only thing that it cites, not in, I would say in the art, but of course it's not in the art, for the proposition that you can go to something less frequent than every other day. Now, my friends this morning, and my friends in their briefs, and the Board eight times in its decision, uses some variant of less than daily, or less frequent than daily, or less often than daily. But of course, that's not the choice. It's not daily or less often than daily. The claims are for three injections a week. And the Board used CON 2009 to suggest that you could go beyond every other day because CON 2009 was twice a week. Now, that's impermissible because what the Board said it would do is to look only at the fact that CON 2009 was initiated, that the study was initiated. If that were right, the Board would not have gone into great detail about the findings of CON 2009, about the conclusions, about what it taught. There's a whole paragraph about that. And in addition to that... The Board could legitimately consider the initiation of the CON study as indicative of what a person of ordinary skill might regard as worthy of investigation, i.e. twice. No, for two reasons. I think that in a different case, that it might be permissible to look at a publication indicating that there was a study begun. But in this case, there's no publication before the priority date indicating that anybody knew that CON had begun this study. So that's one reason. And the second reason is the really broad reasoning that the Board applied in accrediting CON 2009, which is saying that the mere fact of initiating the study showed not just a motivation to combine, but a reasonable expectation of success. Now, CON 2009 is a small study, 48 people, and it would be extremely broad to say that any time that anybody begins an investigational study, even a small study like that, that they must automatically have a reasonable expectation of success, and that anyone in the art would share that expectation. So there's no indication whatsoever that anyone in the art knew what Dr. Con was up to with that study, or that anyone would draw that conclusion. So I think that those are all reasons why the Board's decision was impermissible. There's the further reason that, well, if there were something in the art to show that the study had begun, in a PTAP proceeding, it would, of course, have to be a patent or a printed publication. It couldn't just be an expert testimony that people knew about this. Well, PTAP is not limited to printed publications with respect to evidence that is available, as opposed to prior art. As opposed to prior art, that's right. So you're not suggesting, are you, that they couldn't consider that kind of evidence just as evidence of the state of the art and so forth? We've held on a number of occasions that various types of evidence are admissible, including experts' testimony. We're not disputing that. What we are pointing out, and what you've never held, what the Court has never held, is that you could look at something that's not in the art, you can look at expert testimony that doesn't go to the art, to establish reasonable expectation of success. So the scope of prior art is what informs whether a skilled artisan, at the priority date, would have had a reasonable expectation of success. And prior art, of course, in a Board proceeding, is limited to patents and printed publications. No, we're not saying no experts can ever testify before the Board. But we are saying, in this case, what the Board really did was to use this to fill a gap in the prior art. That is not using it. What about, it doesn't seem to be what they're saying. Like on appendix page 15, they seem to be talking about, the Board is talking about Kahn, and not saying that it's relying on Kahn to show reasonable expectation of success, but rather just probative of the fact that those skilled in the art were motivated to investigate dosing regimens with fewer injections. Well, I would point, Your Honor, to page 21, the last sentence on page 821, in which the Board specifically says, because Kahn 2009 commenced its study, dot, dot, dot, dot, further convincing that an ordinary artisan would have had a reasonable expectation of success. It doesn't get more black and white than that. That it was relying on this non-prior art study for reasonable expectation of success. Bottom of page 821. So we've dealt with one of the two things, Kahn 2009, and what's the Board, and we could stay on page 821, because this is where the reasoning is contained. We've dealt with one of the two things that the Board cited, which is legally impermissible. And the other thing that the Board cites for this three injections a week point, is the idea that this is a forgiving drug, and there's a range of doses out there in the prior art. And so therefore, three injections a week is OK. Because the total quantity, 120 milligrams, falls within this range of doses. Now, I think it's important to note that even the other side's expert would not defend that proposition as far as it goes. Because if what matters is the total weekly dose, a concept that does not appear in the prior art for this drug anywhere, if it really were the total weekly dose, then two injections a week of 70 milligrams, one injection a week of 140 milligrams, would be exactly the same for reasonable expectation of success purposes. And at page 11180, their expert declined to say that there would be a reasonable expectation of success. And why not? Because of the gap. Because of the gap between injections. A 72-hour gap between injections is exactly what's missing from the prior art, and what the board fails to muster any defense of, other than CON 2009, when it's twice weekly. But it certainly fails to establish why a skilled artisan would believe that three injections a week with this 72-hour gap would succeed. They have this discussion about whether gilaterum or acetate is a forgiving drug, but that's based on one thing and one thing only. It's based on the dosing of the daily 20-milligram product, and the dosing instructions say, if you miss a dose, you forget to take a dose of your 20-milligram product daily, don't take a second dose, in other words, don't take 40 milligrams, skip it, and go on to the next day, take your next regularly scheduled dose. That is far from licensed to go as far as 72 hours, and of course has nothing to say about the 40-milligram quantity as a dose. That's what Forte studied, but the board isn't driving this reasonable expectation of success from anything in Forte, because Forte, of course, is a daily study. It studies the 40-milligram quantity, but there are no clinical trials of 40 milligrams of anything less than daily. All there is is claim three of Pinkhazy, and that is not supported by any data at all. So reasonable expectation of success, we think, is a major failing of the board's decision. I want to talk briefly about its failure to address the minimum effective dose principle and the aspects of this drug that make it very difficult to predict the cyclopenzaprine argument that the court has already spent some time on. The board could perhaps have said some of the things that were brought out in the questioning, but it simply didn't address cyclopenzaprine at all. It also didn't address the minimum effective dose principle, even though the other side's expert, Dr. Peruca, agreed specifically that higher doses may be used if they lead to increased efficacy with acceptable side effects. That's at 64-60. That's the other side's expert. What's your view on whether the board has to address each and every argument that is raised? I mean, we have cases that have said that they need to raise the primary arguments. Do you think N-ray cyclopenzaprine was your primary argument or a primary argument? I think it's fair to call it a primary argument because regardless of how many times that case is cited, there's, I think, a nine-page range in our papers in which we address this principle and its application to this drug, why this drug was not well understood, its mechanism of action was unknown, and why you couldn't simply extrapolate, well, if 20 daily is OK, then 40 every other day must be OK, much less 43 times a week, that this is not the kind of drug from which you could do that kind of back-of-the-envelope extrapolating. What you would need are studies. That certainly is an argument that we made to the board. We don't think that the board has adequately addressed it. The same thing with the minimum effective dose. Another thing that this court's case is whole is that the board has to give some reason for disagreeing with something that is common ground between the parties. And in this case, the quote that I've just given you from Dr. Karuka agrees that the minimum effective dose is what a skilled artisan would prefer, absent evidence in the art that there's increased efficacy. And it's exactly what Forte taught, that there is no increased efficacy with the 40-milligram dose. I see that I'm into my rebuttal time. Do you have a question, Judge? Well, just briefly, there was increased efficacy to the extent that, as we discussed with Mr. O'Quinn, there was more rapid onset, at least for the daily, at 40. I'm very glad you brought that up, Judge Bryson, because that and the monkey studies, the two questions that you asked during the first argument, are two excellent examples of things that the board absolutely did not credit. I understand they decided not to rely on the monkeys, but where did they say that they weren't relying on the early onset or early efficacy? They don't even mention it. I didn't think so, but they don't disclaim reliance on it. Okay, but the reason that they give in discussing Forte is only this, that Forte does not teach away, does not discredit or discourage the use of the 40-milligram dose. There's nothing in the board's opinion making any findings suggesting that the 40 has any advantage. Thank you. May it please the Court, David Anstett, Perkins Coie, I represent Milan, and will be arguing on behalf of all petitioners below. And before I lay out my plan for the argument, I want to address this question that you just asked, Judge Bryson, because I think my friend misspoke when he said that the board did not, in any of their opinions, refer to what you have referred to, which is the finding that the 40-milligram dose does have an advantage, which is an earlier onset of action. And if you look at Appendix Page 12, that's the board's decision in the 250 IPR, and there's a comparable page in the board's decisions. In each of the other ones, you'll see there's a block quote from Pinchasi, in which the board says, Indeed, Pinchasi concludes, and then it first talks about the increased efficacy observed with 40-milligrams GA in reducing MRI-measured activity and relapse rate in RRMS patients. But then it goes on in the second paragraph in that block quote to say, Also observed was the accelerated rate at which the 40-milligram day dose became effective as compared to the 20-milligram day dose. This was unexpected. Specifically, the 40-milligram day dose showed efficacy as measured by MRI by the third month, whereas the 20-milligram day dose did not show efficacy until the sixth month. And so the board did make that finding. Okay, but is there anything to indicate that the more rapid onset of action would translate not just to 40 per day, but to 40 per every other day, or even a less frequent administration? I don't think that there is a specific factual finding that the board made on that point, aside from what we're identifying. Is there any evidence to support that proposition? I think there would be some evidence, which is that the 40-milligram day dose does have this effect. It does, but the question, and this came up in the first argument, the question would be whether simply giving the 40 milligrams every other day is the equivalent of 20 milligrams for purposes of the early onset of action. For purposes of the early onset. Why isn't that at least as plausible a proposition as that the 40 milligrams every other day has the same effect for early onset as 40 milligrams every day? I think there is a question about that, but that was a factual finding that the board made. But I think that the broader point here is that the FORTE trial, which was the large clinical trial that compared the 40-milligram and 20-milligram daily dose on a head-to-head basis, found at a minimum, if nothing else, that the 40-milligram daily dose was at least as effective as the 20-milligram daily dose. And then you have the studies in the prior art that show that 20-milligram, or every other day dosing, are equally effective as 20-milligram daily dosing. And one of the findings that the board makes at Appendix 20 is that would have given you, and I think this goes to a question you asked, Judge Stoll, that that would have given the person of ordinary skill in the art a reasonable expectation that 40 milligrams every other day would be efficacious in treating relapsing-remitting multiple sclerosis. And that's a key issue because PINCHASI, as you have noted, is very close prior art. It discloses and claims 40 milligrams every other day dosing. That's a difference of a single dose once every two weeks. So it's very close prior art. And what the board found was, yes, there's no human clinical trial where 40 milligrams every other day was administered to patients, but what you do have is the finding from FORTE that 40 milligrams and 20 milligrams are at least equally effective, and you have multiple studies in the prior art showing that 20 milligrams every other day and 20 milligrams daily are equally, at least equally effective but better tolerated, and that is evidence that would lead a skilled artisan to reasonably expect that PINCHASI's 40-milligram every other day dosing regimen would be efficacious. And then the question becomes, well, what do you do next? What is the skilled artisan interested in next? And from that 40-milligram every other day dosing regimen, it's a very small step to the claimed regimen here of 40 milligrams three times a week. But it's a small step, but isn't it a small step into the dark? It's not a small step into the dark. And let me address that in two ways. One is there was motivation to go to that dosing regimen.  Convenience and also compliance, which is a question. Compliance is what I meant really by convenience. Correct. But I think what you may be raising is the notion of the 72-hour gap. Yeah, of course. And so let's put that in perspective. In a claimed dosing regimen, two-thirds of the doses are separated by 48 hours, and then you have a single 72-hour gap. So those two-thirds of doses in the claimed regimen separated by a 48-hour gap, there is abundant evidence in the prior art that that does not sacrifice efficacy. But is there anything in the prior art or in the evidence in the case that tells us anything about a 72-hour gap except for the monkeys? I think there is, which is, first of all, you had the testimony from Dr. Green that glutaramuracetate is a forgiving drug. Remember, this is a drug that is dosed not in the clinic. Patients don't go into the clinic to take injections of glutaramuracetate. They dose it at home. They self-administer it. And he testified that with drugs like that, you have to have forgiveness because you know patients are going to miss doses. They're not going to comply with the regimen. And that was particularly true for glutaramuracetate because the regimen was daily painful injections in a lifelong disease like MS. So we know patients are not compliant, and in those situations, you have to have a forgiving drug. There was evidence that patients were instructed. Prior art instructions to patients, if you skip or if you forget to take a dose, don't try to double up the dose. Just skip it and then resume with your regularly scheduled dosing regimen. Were there any of those dealt with every other day, or was it exclusively with respect to the daily treatment? Those were instructions with respect to the daily drug. So you're only skipping one day, presumably. Presumably, although I think there's evidence that certainly patients are not 100% compliant with this, even with missing just a single dose. But the other evidence, Judge Bryson, that I think is important, again, that was a factual finding below that the board credited and is supported by substantial evidence, is this known range of doses in the prior art. And so you had a range that went from, on the low end, 70 milligrams per week. That is the 20-milligram every-other-day dosing regimen, average of 70 milligrams per week, all the way up to 280 milligrams per week, and that would be the 40-milligram daily dose that was studied in Forte. And in between those two ranges, you had the 140-milligram weekly dose, which is the approved regimen of 20 milligrams seven times a week, and you have the claimed regimen, which is 140 milligrams every week. And Dr. Green testified that that range, that known range in the prior art, would give you abundant comfort that 120 milligrams dosed over the course of the week would maintain efficacy, and, of course, you would get the tolerability advantages. After all, that 120-milligram weekly dose was extremely close to the FDA-approved regimen of 140 milligrams dosed over the week. And that was testimony of Dr. Green's factual testimony that the board credited and is supported by substantial evidence. And let's weigh that against what they heard from Dr. Ziemsen, who was Teva's expert. Dr. Ziemsen testified, you know, there's some notion that we don't know how this drug works, it's a black box. That wasn't exactly the story that Teva told the board below. Teva told the board that, in fact, we do know a fair amount about how this drug works and its mechanism of action, and based on that, skilled artisans would have expected that you have to dose this drug on a daily basis. And their expert went so far as to say, in fact, based on what you knew about mechanism of action, you would think that the best way to get efficacy is to dose this drug twice a day. And quite frankly, that was credibility-destroying for their expert, because as the board found, there are no studies of twice-a-day injection, and there are abundant studies of less frequent dosing in the prior art. And their expert's position was that wouldn't work, and skilled artisans knew it, and they knew it based on the mechanism of action. And the board didn't credit that testimony with good reason, and those findings were supported by substantial evidence. You mentioned the increased tolerability of the alternate-day treatment, but that seems to me at least potentially does not square with the evidence in Fletcher's Table 5. Have you looked at those numbers carefully? I have. I was looking at those numbers, and they frankly look odd to me. I have looked at them carefully, and I can walk you through chapter and verse. Well, I'd like to. Give me maybe the short version of the chapter and verse, preferably just the verse. So I think the thing that you should take great comfort from is what you pointed out yourself, Judge Bryson, which was that there is no evidence. I mean, the difference that Teva points to is 11.8 percent termination rate every other day, and then they're doing this cross-study comparison minor where there's an 8.9 percent difference, and there was no finding that that was statistically significantly different. But as you pointed out, and in fact, this is getting a bit granular, but they even do the math wrong, Teva does, because one of those patients who dropped out was determined to have dropped out for reasons totally unrelated to the drug, so the actual percentage is not 11.8. It's 10 percent. But the point is, Judge Bryson, there is no evidence that there was a statistically significant difference based on that. But what we do have in Fletcher, and what I think you should take great comfort from, was his finding in text that the only statistically significant difference was the dropouts. It's the dropouts. It's the dropouts. And the dropouts. It's at the .001 level, I think, right? That is precisely right. And the dropouts were far less in the every-other-day dosing group, which is a clear indication that every-other-day dosing is tolerable, but there's more evidence in the prior part that every-other-day dosing is more tolerable. So the CAON 2009 study, not to be confused with CON 2009, CAON 2009, Undisputably Prior Art, that was a rigorous, head-to-head clinical trial, radar-blinded, randomized between 20 milligrams every other day and 20 milligrams daily. And the finding in that study was that the patients in the every-other-day group had significantly less lipoatrophy than the patients in the daily group. And, of course, lipoatrophy, as you heard this morning, is a particularly severe and disfiguring injection site reaction. And the prior art shows that when you decrease the frequency of dosing, you get increased tolerability, and CAON 2009 is an excellent example of that. So hopefully that wasn't too much detail on Table 5. In the time I have left, I do want to know, there were some questions about cyclobenzaprine, and I would like to address that briefly. Judge Reina, I think you made an absolutely critical point. The infringer's obviousness theory in cyclobenzaprine was based entirely on bioequivalence. There was no bioequivalence theory of obviousness in this case. The claim language in cyclobenzaprine was a therapeutically effective plasma concentration. Plasma concentration is PK data, so it was baked into the claims. Therapeutically effective is PD, what the drug does to the body. And what the court found in cyclobenzaprine was that the district court judge had made a mistake and assumed that there was a known PK-PD relationship for an immediate release formulation of a drug, and you could just extrapolate from that to the extended release formulation. But that was a mistake. There was no known PK-PD relationship in cyclobenzaprine, and therefore the whole basis for the obviousness finding there, because that's another thing that the court points out, is that the obviousness theory was based entirely on bioequivalence. The district judge's mistake in assuming something that wasn't true about PK-PD meant that the obviousness analysis was faulty. There are a huge number of differences in this case as compared to cyclobenzaprine. Again, no bioequivalence theory here. Instead, the obviousness theory was based on the extensive human clinical trials of GA at different doses and different dosing frequencies. Another important point was that the court in cyclobenzaprine found that the objective indicia of obviousness weighed heavily in favor of a finding of non-obviousness. Here, they put on evidence of secondary considerations, commercial success, unexpected results, long-felt need. They lost across the board in front of the PTAB on those issues, and they haven't appealed them. Can you address—I want to make sure that you take time to address CON 2009 as it's discussed on page 21 of the board's opinion. Yeah, I can do that, certainly, Your Honor. I think I could address it in each instance. It's referenced essentially three times in the board's opinion. The one that seems perhaps troubling is on page 21. That's the one I'd like you to address. Exactly. Okay, so in appendix 21, the board referenced CON 2009 in a single sentence at the end of a multi-page discussion of reasonable expectations of success. And it did so after finding, first, that there were extensive data— again, I talked about this earlier—that 40 milligrams and 20 milligrams daily were at least equally efficacious, extensive data showing that you didn't need to dose this drug daily, and that 40 milligrams was a logical choice to use in the three-times weekly regimen because of what I talked about earlier, which is this range of non-effective doses in the prior arc. So those were the three totally independent bases from CON 2009. Is it your position that because it's at the end of a long discussion in which there's many other reasons provided that it's a harmless error, if anything, to add it in and also see CON? Absolutely. I have two positions. First of all, I don't think the board used it to fill a gap in the prior arc, to fill a void in the prior arc. I just absolutely dispute that they did that, but that would be the second-level point, absolutely. It would be harmless because the board found many reasons. But do you regard this language as indicative of an improper use? I do not. What is the difference between an improper use and a proper use, in your view, with respect to the take that the board had on 2009 CON? Yeah, CON 2009. What the board said was this was a publication that appeared three weeks after the priority date, but it reported on a study that had begun two years before, in 2007. Go ahead. And all the board was saying that this was further evidence, in addition to all the other evidence that it found a reasonable expectation of success, that skilled artisans would be motivated to look at less frequent dosing regimen. It never said that skilled artisans would be motivated to look at a twice-a-week regimen. It never said that it would. And here's an important point I don't want to lose is this case is very much like this court's decision in Genzyme. In Genzyme, there was an argument that a reference had been brought up in reply and that the board had used it to satisfy key claim limitations. And the board said, no, it didn't do that. The patents were found obvious based on the grounds of unpatentability, and the board did not use this reply declaration to fill a void in the prior art, and that's exactly the case here. This information about the scope of the study was not, I take it, public until the study was published. Is that true? I think it would have been public in the sense that obviously Dr. Kahn would have known about it. The patients would have known about it who were participating. But Dr. Kahn at that point was not working for Teva anyway. No, he was not. He later, I gather. Published a whole lot of prior art showing that less frequent dosing is tolerable and effective. Then Teva went and hired him. That is true. And so I think, again, the due process challenge, I think Genzyme, this court's decision in Genzyme and Belden are directly on point. They had multiple opportunities to address Kahn 2009, some of which they took, some of which they didn't for reasons of their own. And so the notion that there's the statutory argument that my friend Mr. J talked about. They also have in their brief a due process argument. I think the due process argument has no legs either. But just to hone in on the point that Mr. J raised, is there any significance in your view to the fact that the fact of the study was, never mind the results, was not public at the time the priority date? I don't think so. And I think a good example for you, Judge Bryson, is this court's decision in Syntex. And that was a case in which there was a post-priority date publication. It was published five days after the priority date. And the position had been that a particular drug had not been used in pharmaceuticals or had not been used in pharmaceuticals before the priority date. There was a post-priority date publication, as I say, five days later, that said that the use of that pharmaceutical composition was well known in compositions. And this court said that it was incredulous that, first of all, the patent owner said that because it came five days after the priority date, it was worthless. And this court said it was incredulous, incredulous, that's this court's word, that a pharmaceutical composition could go from unknown in the prior arc to well known in the span of five days. And it said it was perfectly appropriate to rely on that post-priority date publication to that point. But you're not saying, if I could ask just one more question, you're not saying, are you, that you could consider the inventor's course of study to show that persons of skill in the art would have been interested in studying what the inventor was studying? Absolutely not. All right, what's the difference between that and what's going on in Kahn? Well, Kahn was not the inventor. I understand that, but it's one step away. But what's the difference fundamentally? What Kahn 2009, Your Honor, is, respectfully, is merely additional evidence on top of other abundant evidence that counteracted. Remember, this came in, this came into the proceedings in reply because their expert had said skilled artisans were not interested in less than daily dosing because, according to their mechanism of action theory, you had to dose it daily. The board just said this is additional evidence to all the other prior art studies that, in fact, skilled artisans were interested. Okay. Okay, we thank you. Mr. Jay, we're going to put you back at four minutes, okay? Thank you very much, Judge Raynon. I appreciate that. Let me begin with Kahn 2009. I guess Judge Bryson asked, you know, what was this known to the public? And the test that the board applies for printed publication that it can look at is at page A640, which from the institution decision, looking at something else, you know, is it sufficiently accessible to the public? This was not. We asked Dr. Green that at his deposition. Page A11177 through 78, we asked, you know, could he identify anything in the prior art, indicating that skilled artisans were aware that Dr. Kahn had started this study, and he couldn't come up with anything. I think the difference between this case and syntax is right in what my friend Mr. Anstett said. Syntax said right after the priority date that a particular proposition was well known. This is very different. This is a study that comes out after the priority date and is asking, is reading it to indicate not only that everybody knew that the study had been commenced without any basis, but also that anybody who knew that the study had been commenced would have inferred that there was a reasonable expectation that the study would succeed. As I said in the opening argument, extremely broad and not supported by any of this course cases, certainly not by syntax. I want to talk a bit about forgiving drug. The concept of it being a forgiving drug is not in the prior art. That's just Dr. Green's characterization of the dosing regimen. All you will see in the dosing regimen is that for the 24, when you're taking it every 24 hours. Isn't Dr. Green's testimony, that can be relied on. He was a person of ordinary skill. There was no objection to him as being an expert. We're not, but I think you have to look at the stated basis for the opinion that he's given. It's not that he is giving a, he's not referring to some accepted concept of it being a forgiving drug. Expressing his characterization of the dosing instructions for 20 mg Copaxone. Then of course the board goes on to look in addition at the dosing instructions for the patented invention that said in its motion to strike decision that it wasn't, although it had referred to it several times in its decision that it wasn't actually relying on it. But there's a big difference, really my point is, there's a big difference between dosing instructions that say when you're taking 20 mg every day, you may sometimes, if you forget, skip a dose. That's quite different from saying skip two days every single week, and while also skipping a day every time you take an injection, because you're now going to 40 mg with a gap in between. To say that that is taught by the skip a dose occasionally instructions is just over reading the prior art. On, just a word about Pinkazi, Cohen, But whether you can skip one dose or several, it was clear that there was evidence that you could skip doses and not sacrifice the efficacy of the drug. No, Your Honor, it does not say anything about not sacrificing the efficacy. It merely, this is advice to the patient, what happens if you forget? Perhaps you're referring to a different piece of the art, but what we're talking about is what Dr. Green was citing. Those are the dosing instructions, and it does not say there are no consequences. It says that you're faced with a choice when your patient has forgotten to take an injection. You can supplement it by taking a second injection, or you can skip that dose and take your next regularly scheduled injection. And faced with those choices, the FDA-approved instruction to the patient is to go with your regularly scheduled one. But that's really quite far from saying that there is no sacrifice in efficacy in skipping one day, and it would be even farther to say that there's no sacrifice in efficacy from skipping 72 hours every single week. I mean, that is, Judge Bryson said, and I'm talking to my friend, Mr. Rance, that that really is the leap into the dark. And what the board did— I think they said the small step into the dark. I accept the correction with my apologies. But leap or step, it definitely was into the dark, and I think you can see it, pages 15, 18, and 21, just how the board tried to use 2000-con-2009 to shine a little light into that darkness, because you see it's underscoring, it's italicizing, twice-a-week dosing. The only thing that the board had before it—not properly before it, but before it— that had anything to say about less than every other day. Three times a week, that was in the dark. There's nothing in the prior article on it. Unless the court has further questions. Thank you. All right, we thank the parties for the argument.